## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SARA BETH COFFEY, derivatively on behalf of SPRINKLR, INC., <br><br> Plaintiff, <br><br> v. <br><br> RAGY THOMAS, MANISH SARIN, NEERAJ AGRAWAL, EDWIN GILLIS, KEVIN HAVERTY, YVETTE KANOUFF, EILEEN SCHLOSS, TARIM WASIM and TRAC PHAM, <br><br> Defendants, <br><br> and <br><br> SPRINKLR, INC., <br><br> Nominal Defendant. | Case No.: 1:25-cv-02242 <br><br><br><br> **DEMAND FOR JURY TRIAL** |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## <u>INTRODUCTION</u>

Plaintiff Sara Beth Coffey ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Sprinklr, Inc. ("Sprinklr" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Ragy Thomas ("Thomas"), Manish Sarin ("Sarin"), Neeraj Agrawal ("Agrawal"), Edwin Gillis ("Gillis"), Kevin Haverty ("Haverty"), Yvette Kanouff ("Kanouff"), Eileen Schloss ("Schloss"), Tarim Wasim ("Wasim") and Trac Pham ("Pham") (collectively, the "Individual Defendants," and together with Sprinklr, the "Defendants")

for breaches of their fiduciary duties as directors and/or officers of Sprinklr, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Thomas and Sarin for contribution under Section 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Sprinklr, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from March 29, 2023 through June 5, 2024, both dates inclusive (the "Relevant Period").

2.      Sprinklr offers an enterprise software-as-a-service platform "purpose-built to help enterprises break down information and organization silos across the customer journey, tap into unstructured digital data and utilize AI to create a persistent, unified view of each customer – at scale." Sprinklr's software is called Unified Customer Experience Management ("Unified-CXM"), which, according to the Company, "enables customer-facing teams, from Customer Service to Marketing, to collaborate across internal silos, communicate across digital channels,

and leverage a complete suite of capabilities to deliver better, more customer experiences at scale – all on one unified, AI-powered platform."

3.      During the Relevant Period, the Individual Defendants represented that, for Sprinklr's fiscal year ending January 31, 2024[1], (the "2024 Fiscal Year"), the Company kept prioritizing development of its AI capabilities, its entrance into the Contact Center as a Service ("CCaaS") market, and its continued growth from the Company's already-existing portfolio of products.

4.      In so doing, the Individual Defendants minimized the risk Sprinklr faced from seasonality and changes in macroeconomic conditions and overstated the Company's projected revenue and growth outlook. Indeed, contrary to certain of the Individual Defendants material public representations, the Company had migrated from its established growth areas to emphatically prioritize scaling a new business venture with CCaaS—a decision that produced artificially inflated growth in the short-term. This transition to CCaaS began in the second quarter of 2022—the period ending June 30, 2021. Over the ensuing two fiscal years, the Company injected significant funds into the new venture, which negatively impacted Sprinklr's already-established business. The Individual Defendants further made, and/or caused the Company to make, materially false and misleading statements by routinely making projections that did not consider the problems involved in scaling a new product, in addition to not disclosing that Sprinklr did not have sufficient financial forecasting capabilities at that time.

5.      For instance, during an earnings conference call held on March 29, 2023 to discuss Sprinklr's financial performance for the fourth quarter and full year of the 2023 Fiscal Year,

_____

[1] The Company's fiscal year ends on January 31 of each calendar year. For the fiscal year ended January 31, 2023 (the "2023 Fiscal Year").
For the fiscal year ended January 31, 2025 (the "2025 Fiscal Year").

Defendant Thomas represented that the Company "*will continue to innovate and win in social. It's where we started as a company, and that foundation has enabled us to build disruptive new opportunities like we are doing in CCaaS*."[2]

6.       However, unbeknownst to the public during the Relevant Period, these statements regarding the effectiveness of the Company's transition to the CCaaS market proved to be false, as the reality was that Sprinklr was facing obstacles with its growth plan and execution, especially with respect to the impact of macroeconomic conditions on the Company's business. Due to the foregoing, the Company's subscription revenue and total revenue slowed. Despite this, during the Relevant Period, the Individual Defendants concealed this reality, instead highlighting the effectiveness of the Company's wider entrance into the CCaaS market and minimizing the risk Sprinklr faced with changing macroeconomic conditions.

7.       The truth began to emerge on December 6, 2023, during the Company's earnings conference call held to discuss Sprinklr's third quarter of the 2024 Fiscal Year. During the call, the Individual Defendants revealed that the overall number of customers spending more than $1 million had fallen, citing macroeconomic conditions. Also, during the call, the Individual Defendants revealed that the Company cut its growth forecast for the fourth quarter and full fiscal year ending on January 31, 2025 (the "2025 Fiscal Year"), from 16% growth to just 10% growth.

8.       On this news, the price of the Company's common stock fell $5.59 per share, or approximately 33%, from a closing price of $16.70 per share on December 6, 2023 to a closing price of $11.11 per share on December 7, 2023. However, the Individual Defendants continued to obfuscate the truth about the Company's growth capabilities while also minimizing the risk Sprinklr faced from changing macroeconomic conditions.

---

[2] Unless otherwise noted, all emphasis is added.

9.      The truth did not fully emerge until June 5, 2024, when the Individual Defendants revealed that Sprinklr's growth forecast would be cut again, from 10% growth to only 7% growth for the 2025 Fiscal Year, citing withering customer retention and poor macroeconomic conditions.

10.     On this news, the price of the Company's common stock fell an additional $1.64 per share, or approximately 15%, from a closing price of $10.84 per share on June 5, 2024 to a closing price of $9.20 per share on June 6, 2024.

11.     During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's shift from established sources of growth to emphatically prioritize scaling a new business venture with CCaaS produced artificially inflated growth in the short-term; (2) as such, the Company's already-established sources of revenue were negatively impacted; (3) the Company did not have sufficient financial forecasting capabilities; (4) as a result of this, the Company's growth projections did not consider the problems involved in scaling a new product; (5) the Company minimized the true impact of changing macroeconomic conditions had on the business; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

12.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, two of the Individual Defendants sold Company

shares at inflated prices for combined total proceeds of approximately $5.5 million.

13. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

14. In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Sprinklr to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between January 1, 2024 and May 31, 2024, approximately 14,031 shares of Sprinklr common stock were repurchased, costing the Company *over $170,697*. As the Company's stock was actually worth only $9.20 per share, the price at which it was trading when markets closed on June 6, 2024, the Company overpaid for repurchases of its own stock *by over $41,594* in total.

15. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, losses due to the repurchases discussed herein, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

17. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of their collective engagement in fraud, of the

substantial likelihood of the directors' liability in this derivative action, of the CEO's, the CFO's, and the Company's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

22.     Plaintiff is a current shareholder of Sprinklr. Plaintiff owns restricted stock units ("RSUs") of Sprinklr that were vested since January 11, 2022, and has continuously owned them since then and to date.

**Nominal Defendant Sprinklr**

23.     Sprinklr is a Delaware corporation with its principal executive offices at 441 9th Avenue, Suite 12th Floor, New York, New York 10001. Sprinklr's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CXM."

**Defendant Thomas**

24.     Defendant Thomas founded the Company in September 2009. From its founding until June 2024, he served as the Company's CEO. From June 2024 until October 31, 2024, he served as Co-CEO. Since the Company's founding, he has also served as the Chairman of the Board. and as a Company director since August 2018. According to the proxy statement that the Company filed with the SEC on May 3, 2024 (the "2024 Proxy Statement"), as of April 16, 2024, Defendant Thomas beneficially owned 688,881 shares of the Company's Class A common stock and 59,953,366 shares of the Company's Class B common stock. Thus, in total, Defendant Thomas held 42.9% of the total voting power of the Company. Given that the price per share of the Company's common stock at the close of trading on April 16, 2024 was $11.34, Defendant Thomas owned approximately $7.8 million worth of Sprinklr stock as of that date.

25.     For the 2024 Fiscal Year, Defendant Thomas received $12,414,624 in total compensation from the Company. This included $570,833 in salary, $11,431,922 in option awards, $222,674 in non-equity incentive plan compensation, and $189,195 in all other compensation.

26.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Thomas made the following sales of

Company common stock:

| Date | Number of Shares Sold | Average Price/Share | Proceeds |
|---|---|---|---|
| 5-1-2023 | 1,557 | $11.89 | $18,512 |
| 6-16-2023 | 17,167 | $14.56 | $249,951 |
| 7-31-2023 | 1,613 | $13.74 | $22,162 |
| 9-18-2023 | 16,633 | $14.86 | $247,166 |
| 10-30-2023 | 1,607 | $13.33 | $21,421 |
| 12-18-2023 | 16,181 | $11.48 | $185,757 |
| 1-29-2024 | 1,314 | $12.96 | $17,029 |
| 3-18-2024 | 11,742 | $13.03 | $152,998 |
| 4-29-2024 | 1,128 | $12.02 | $13,558 |

Thus, in total, before the fraud was exposed, he sold 68,942 shares of Company common stock on inside information, for which he received approximately $928,554 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

27.    The 2024 Proxy Statement stated the following about Defendant Thomas:

Ragy Thomas has served as our Chief Executive Officer and Chairman of our board of directors since founding Sprinklr in September 2009. Previously, Mr. Thomas held various positions with Epsilon, a division of Alliance Data Systems Corp. now owned by Publicis Groupe, where he was most recently the president of interactive services from September 2006 to June 2008. From 2001 to 2005, Mr. Thomas also was the chief technology officer of Bigfoot Interactive, an email communications company acquired by Epsilon. Mr. Thomas earned an M.B.A. in Finance and Information Systems from the New York University Leonard N. Stern School of Business and a Computer Science Engineering degree from Pondicherry University in India. We believe that Mr. Thomas is qualified to serve as a member of our board of directors because of his experience building and leading businesses and his insight into corporate matters as our Founder, Chairman and Chief Executive Officer.

**Defendant Sarin**

28.    Defendant Sarin has served as the Company's CFO since January 2022. According to the 2024 Proxy Statement, as of April 16, 2024, Defendant Sarin beneficially owned 60,836 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on April 16, 2024 was $11.34, Defendant Sarin owned

approximately $689,880 worth of Sprinklr stock as of that date.

29.    For the 2024 Fiscal Year, Defendant Sarin received $4,771,317 in total compensation from the Company. This included $477,400 in salary, $167,600 in non-equity incentive plan compensation, and $3,960 in all other compensation.

30.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Sarin made the following sale of Company common stock:

| Date | Number of Shares Sold | Average Price/Share | Proceeds |
|---|---|---|---|
| 3-16-2023 | 40,417 | $10.28 | $415,486 |
| 6-16-2023 | 18,899 | $14.56 | $275,169 |
| 9-18-2023 | 18,532 | $14.86 | $275,385 |
| 9-20-2023 | 20,000 | $14.74 | $294,800 |
| 11-15-2023 | 9,200 | $15.03 | $138,276 |
| 11-14-2023 | 10,800 | $15.00 | $162,000 |
| 12-1-2023 | 20,000 | $16.02 | $320,400 |
| 12-6-2023 | 20,000 | $17.01 | $340,200 |
| 12-18-2023 | 17,814 | $11.48 | $204,504 |
| 1-11-2024 | 60,651 | $12.01 | $728,418 |
| 3-18-2024 | 66,388 | $12.93 | $858,396 |
| 3-19-2024 | 49,234 | $13.03 | $641,519 |

Thus, in total, before the fraud was exposed, he sold 351,935 shares of Company common stock on inside information, for which he received approximately $4,654,553 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

31.    The 2024 Proxy Statement stated the following about Defendant Sarin:

Manish Sarin has served as our Chief Financial Officer since January 2022. Prior to joining Sprinklr, Mr. Sarin was the Chief Financial Officer of Exabeam, Inc. from October 2018 to November 2021. Prior to that, he served as the Executive Vice President of Finance at Proofpoint, Inc. from October 2012 to September 2018. Earlier in his career, Mr. Sarin advised technology companies on corporate finance matters while serving at Merrill Lynch and J.P. Morgan. Mr. Sarin holds a

degree in Computer Science from the Indian Institute of Technology (Banaras Hindu University) and an M.B.A. from Columbia Business School.

**Defendant Agrawal**

32.     Defendant Agrawal has served as a Company director since June 2011. He currently also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 16, 2024, Defendant Agrawal beneficially owned 12,695,695 shares of the Company's Class A common stock and 6,710,304 shares of the Company's Class B common stock. Thus, in total, Defendant Agrawal held 6% of the total voting power of the Company. Given that the price per share of the Company's common stock at the close of trading on April 16, 2024 was $11.34, Defendant Agrawal owned approximately $76 million worth of Sprinklr stock as of that date.

33.     For the 2024 Fiscal Year, Defendant Agrawal received $253,015 in total compensation from the Company. This included $53,029 in fees earned or paid in cash and $199,986 in stock awards.

34.     The 2024 Proxy Statement stated the following about Defendant Agrawal:

Neeraj Agrawal has served as a member of our board of directors since August 2011. Mr. Agrawal is a General Partner at Battery Ventures, a global technology-focused investment firm, where he has worked since August 2000. Mr. Agrawal serves on the board of directors of several private technology companies, including Dataiku, Inc., Pendo, Inc., Tealium, Inc. and Workato, Inc. He is a member of the board of directors of Braze, Inc. and was previously a member of the boards of directors of Amplitude, Inc., Bazaarvoice, Inc., Coupa Software Incorporated, Marketo, Inc. and Wayfair, Inc. Mr. Agrawal holds a B.S. in Computer Science from Cornell University and an M.B.A. from Harvard Business School. We believe that Mr. Agrawal is qualified to serve as a director based on his extensive business experience in the software and web services industries, his experience in venture capital and his service as a director of various public and private companies.

**Defendant Gillis**

35.     Defendant Gillis has served as a Company director since November 2023. He also

serves as the Chair of the Audit Committee. According to the 2024 Proxy Statement, as of April 16, 2024, Defendant Gillis beneficially owned 56,724 shares of the Company's Class A common stock and 250,000 shares of the Company's Class B common stock. Given that the price per share of the Company's common stock at the close of trading on April 16, 2024 was $11.34, Defendant Gillis owned approximately $643,250 worth of Sprinklr stock as of that date.

36.      For the 2024 Fiscal Year, Defendant Gillis $259,986 in total compensation from the Company. This included $60,000 in fees earned and paid in cash and $199,986 in stock awards.

37.      The 2024 Proxy Statement stated the following about Defendant Gillis:

Edwin Gillis has served as a member of our board of directors since November 2015. Mr. Gillis previously served on the boards of directors of Teradyne, Inc. from October 2006 to May 2023, LogMeIn, Inc. from November 2007 to September 2020, Sophos Group PLC from October 2009 to September 2017 and Responsys, Inc. from March 2011 until it was acquired by Oracle Corporation in February 2014. His other board positions have included AppNexus, Bladelogic, EqualLogic, Endeca, Insidesales.com, Plex and Trizetto. Mr. Gillis also has held executive advisory and financial leadership roles at companies including Avaya Inc., Lotus Development Corporation, Skype, Symantec Corporation (NortonLifeLock), PTC Inc. and Veritas Software Corporation. He also was a certified public accountant and a partner at Coopers & Lybrand L.L.P. (now PricewaterhouseCoopers). Mr. Gillis received a B.A. in Government from Clark University, an M.A. in International Relations from the University of Southern California and an M.B.A. from the Harvard Business School. We believe that Mr. Gillis is qualified to serve as a director because of his financial and accounting expertise, as well as his extensive experience on public company boards of directors and as a senior executive of publicly held and private technology companies.

**Defendant Haverty**

38.      Defendant Haverty has served as a Company director since December 2022. He also serves as a member of the Compensation Committee. According to the 2024 Proxy Statement, as of April 16, 2024, Defendant Haverty beneficially owned 33,667 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on April 16, 2024 was $11.34, Defendant Haverty owned approximately $381,784 worth

of Sprinklr stock as of that date.

39.    For the 2024 Fiscal Year, Defendant Haverty received $177,733 in total compensation from the Company. This included $70,885 in fees earned and paid in cash and $106,848 in stock awards.

40.    The 2024 Proxy Statement stated the following about Defendant Haverty:

Kevin Haverty has served as a member of our board of directors since December 2022. From December 2011 to February 2024, Mr. Haverty served in various senior positions at ServiceNow Inc., including Chief Revenue Officer and most recently as Vice Chairman, Global Public Sector. From January 2010 to December 2011, Mr. Haverty served as Vice President, Americas Sales of the Backup Recovery Systems division of Dell EMC (formerly EMC Corporation). From June 2006 to January 2010, Mr. Haverty held senior positions at Data Domain (through its acquisition by EMC), including Vice President of Americas Sales. Mr. Haverty holds a B.A. degree in Political Science from Providence College and was a US Army ROTC Distinguished Military Graduate. He served ten years in the US Army National Guard and is a veteran of the Gulf War, Operation Desert Storm. We believe that Mr. Haverty is qualified to serve as a member of our board of directors because of his extensive knowledge of the technology industry, including his role in senior positions at a major software company.

**Defendant Kanouff**

41.    Defendant Kanouff has served as a Company director since August 2018. She also serves as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 16, 2024, Defendant Kanouff beneficially owned 50,135 shares of the Company's Class A common stock and 300,000 shares of the Company's Class B common stock. Given that the price per share of the Company's common stock at the close of trading on April 16, 2024 was $11.34, Defendant Kanouff owned approximately $568,531 worth of Sprinklr stock as of that date.

42.    For the 2024 Fiscal Year, Defendant Kanouff received $222,486 in total compensation from the Company. This included $22,500 in fees earned and paid in cash and $199,986 in stock awards.

43.     The 2024 Proxy Statement stated the following about Defendant Kanouff:

Yvette Kanouff has served as a member of our board of directors since August 2018. Ms. Kanouff also has been a Partner at JC2 Ventures LLC since July 2019, where she also serves as advisor and board member to various private companies. She previously held various positions at Cisco Systems, Inc. from June 2014 to June 2019 and was most recently senior vice president and general manager of its service provider business. Prior to joining Cisco, Ms. Kanouff served in executive positions at Cablevision Systems, SeaChange International, and Time Warner Cable. She serves on the public boards of Amdocs Limited, Entegris, Inc. and Science Applications International Corp. She holds a B.S. and M.S. in Mathematics from the University of Central Florida and received her Corporate Director Certificate from Harvard Business School in 2022. We believe that Ms. Kanouff is qualified to serve as a member of our board of directors because she has more than 20 years of service provider, media and software experience.

**Defendant Schloss**

44.     Defendant Schloss has served as a Company director since January 2022. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. According to the 2024 Proxy Statement, as of April 16, 2024, Defendant Schloss beneficially owned 66,042 shares of the Company's Class A common stock and 45,000 shares of the Company's Class B common stock. Given that the price per share of the Company's common stock at the close of trading on April 16, 2024 was $11.34, Defendant Schloss owned approximately $748,916 worth of Sprinklr stock as of that date.

45.     For the 2024 Fiscal Year, Defendant Schloss received $409,121 in total compensation from the Company. This included $55,250 in fees earned and paid in cash and $353,871 in stock awards.

46.     The 2024 Proxy Statement stated the following about Defendant Schloss:

Eileen Schloss has served as a member of our board of directors since January 2022. Ms. Schloss has served as an Operations Advisor to Advent International Corporation since December 2019. Prior to joining Advent, Ms. Schloss was the Executive Vice President, Human Resources and Real Estate for Medidata Solutions, Inc. from 2012 to March 2017. Ms. Schloss also has served as Executive Vice President, Human Resources for Rovi Corporation from 2007 to 2012, and as

Vice President, Administration for Caspian Networks, Inc. from 2002 to 2006. Ms. Schloss currently serves on the board of directors of CCC Intelligent Solutions, Inc., where she is chair of the compensation committee and a member of the audit committee. Ms. Schloss holds a B.S. in Organizational Behavior from the University of San Francisco and a M.S. in Technology Management from Pepperdine University. Ms. Schloss was named to National Association of Corporate Director ("NACD") Directorship 100 in 2022, and, in March 2023, she obtained NACD's Directorship Certification. We believe that Ms. Schloss is qualified to serve as a member of our board of directors because of her extensive experience with acquisitions, divestitures, change initiatives and compensation decisions.

### Defendant Wasim

47.     Defendant Wasim has served as a Company director since October 2020. He also serves as a member of the Audit Committee and as the Chair of the Compensation Committee.

48.     The 2024 Proxy Statement stated the following about Defendant Wasim:

Tarim Wasim has served as a member of our board of directors since October 2020. Mr. Wasim is a Partner at Hellman & Friedman LLC where he focuses on the software, Internet and services sectors. Mr. Wasim also serves as a member of the boards of directors of Checkmarx Ltd., Curriculum Associates, LLC and Genesys Cloud Services. Mr. Wasim previously served on the boards of directors of AlixPartners, LLP, Internet Brands, Inc., Renaissance Learning, Inc. and SimpliSafe, Inc. Prior to joining Hellman & Friedman in 2005, Mr. Wasim was employed by Bain Capital and worked as a consultant at Bain & Company. He received an A.B. in Engineering from Dartmouth College and an M.B.A. from the Harvard Business School. We believe that Mr. Wasim is qualified to serve as a member of our board of directors because of his extensive knowledge of the software sector, as well as his experience serving as a director of multiple Hellman & Friedman portfolio companies.

### Defendant Pham

49.     Defendant Pham served as the Company's co-CEO from June 2024 until November 2024, and as a Company director from June 2023 until November 2024. He previously served as the Company's Interim Chief Operating Officer since January 2024. According to the 2024 Proxy Statement, as of April 16, 2024, Defendant Pham beneficially owned 73,239 shares of the Company's Class A common stock. Given that the price per share of the Company's common

stock at the close of trading on April 16, 2024 was $11.34, Defendant Pham owned approximately

$830,530 worth of Sprinklr stock as of that date.

50.     For the 2024 Fiscal Year, Defendant Pham received $249,986 in total

compensation from the Company. This included $50,000 in fees earned or paid in cash and

$199,986 in stock awards.

51.     The 2024 Proxy Statement stated the following about Defendant Pham:

Trac Pham has served as our Interim Chief Operating Officer since January 2024
and as a member of our board of directors since June 2023. Mr. Pham previously
served as Chief Financial Officer at Synopsys, Inc. from December 2014 to
December 2022 and was responsible for finance, strategy and corporate business
development, and information technology. Previously, he was Vice President of
Corporate Finance and Vice President of Financial Planning and Strategy at
Synopsys. Mr. Pham serves on the board of directors and is the chair of the audit
committee at UKG, Inc. and SiFive, Inc. Mr. Pham holds a B.A. in Economics from
UC Berkeley and a Master of Pacific International Affairs from the School of
Global Policy & Strategy at UC San Diego, where he was a Schoepflin Fellow. We
believe that Mr. Pham is qualified to serve as a member of our board of directors
because of his financial and accounting expertise, as well as his extensive
experience as a senior executive of a technology company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

52.     By reason of their positions as officers, directors, and/or fiduciaries of Sprinklr and

because of their ability to control the business and corporate affairs of Sprinklr, the Individual

Defendants owed Sprinklr and its shareholders fiduciary obligations of trust, loyalty, good faith,

and due care, and were and are required to use their utmost ability to control and manage Sprinklr

in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to

act in furtherance of the best interests of Sprinklr and its shareholders so as to benefit all

shareholders equally.

53.     Each director and officer of the Company owes to Sprinklr and its shareholders the

fiduciary duty to exercise good faith and diligence in the administration of the Company and in

the use and preservation of its property and assets and the highest obligations of fair dealing.

54.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Sprinklr, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

55.    To discharge their duties, the officers and directors of Sprinklr were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

56.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Sprinklr, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Sprinklr's Board at all relevant times.

57.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal

controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

58.     To discharge their duties, the officers and directors of Sprinklr were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Sprinklr were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Sprinklr's own Code of Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Sprinklr conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Sprinklr and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Sprinklr's operations would comply with all applicable laws and Sprinklr's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

59.    Each of the Individual Defendants further owed to Sprinklr and the shareholders the duty of loyalty requiring that each favor Sprinklr's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

60.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Sprinklr and were at all times acting within the course and scope of such agency.

61.    Because of their advisory, executive, managerial, directorial, and controlling positions with Sprinklr, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

62.    The Individual Defendants, because of their positions of control and authority,

19

were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Sprinklr.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

63.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

64.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

65.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Sprinklr was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

66.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

67.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Sprinklr, and was at all times acting within the course and scope of such agency.

## SPRINKLR'S CODE OF CONDUCT

### *Code of Conduct*

68.     Sprinklr's Code of Conduct "applies to employees and anyone working on Sprinklr's behalf. Every employee, officer, director, and third party acting for or on behalf of Sprinklr, such as partners, contractors, agents, vendors, suppliers, and/or other third-party agents, must read, understand, and follow this Code. In addition, Sprinklrites cannot have friends or family act on their behalf to indirectly violate this Code." Additionally, the Code of Conduct states that "In addition to adhering to Sprinklr's policies, standards, procedures, and guidelines (collectively, Sprinklr's Governance), which is consistent with this Code and provides further detail and guidance on the topics covered below, Sprinklrites should also apply good judgment and the highest personal and ethical standards in making business decisions."

69.     Under the heading "Compliance with Laws," the Code of Conduct states the following, in relevant part:

> Sprinklr is a global company committed to following the local laws wherever we do business.  Compliance with the law is the foundation of this Code and our

21

expectation of every Sprinklrite.

Our success depends upon each employee operating within legal guidelines and cooperating with local, national, and international authorities. Certain laws, such as those pertaining to security and data privacy, are core to our business. These laws apply to various types of information, including personal information, financial information, and other sensitive information. Depending on your role, there are other laws that may relate to your work at Sprinklr, such as laws prohibiting corruption, unfair competition, and rules and regulations governing trade controls, exports, and imports.

While we do not expect all Sprinklrites to memorize every detail of these laws, everyone is expected to be familiar with the legal and regulatory obligations that are relevant and applicable to your business units and areas of responsibility, which are outlined in this Code and in Sprinklr's Governance. We also expect all Sprinklrites to spot issues and ask for advice from Sprinklr's Legal Team, Culture & Talent Team, leaders, or other subject matter experts as needed.

70.    In the same section, under the subheading "Insider Trading Laws," the Code of Conduct states:

Employees, officers, and directors who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes. All non-public information about Sprinklr or about other companies is considered confidential information. Use of any material, non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is illegal. Please refer to Sprinklr's Insider Trading Policy for more detailed information.

71.    Under the heading "Honest and Ethical Conduct," the Code of Conduct states the following, in relevant part:

Sprinklr's reputation depends on the honesty, fairness, and integrity brought to the job by each Sprinklrite, and the highest standards of personal integrity, sound judgment, and accountability are the foundation of this Code, Sprinklr Governance, and the Sprinklr Way. Acting with honesty, fairness, and integrity is also paramount to earning and maintaining the trust of our customers. Becoming the world's most loved enterprise software company requires that we maintain the integrity of our business operations, the safety and security of the data that we are entrusted to process, and the relationships that we have built with our customers and partners.

72.    In the same section, under the subheading "Maintenance of Corporate Records, Financial Integrity, and Public Reporting," the Code of Conduct states:

Sprinklr's corporate and business records should be completed accurately and honestly. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, partners, suppliers, creditors, employees, and others with whom we do business. As a result, it is essential that Sprinklr's books, records, and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs, and expenses, as well as all transactions and changes in assets and liabilities.

The integrity of Sprinklr's records and public disclosure depends upon the validity, accuracy, and completeness of the information supporting the entries to our books of account. Making false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. We further require that:

• No entry is made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities, or that misclassifies any transaction   as to accounts or accounting periods;

• Transactions are supported by appropriate documentation;

• The terms of sales and other commercial transactions are reflected accurately in the   documentation for those transactions, and all such documentation be reflected accurately in our books and records;

• You comply with all Sprinklr systems of internal controls; and

•No cash or other asset is maintained for any purpose in any unrecorded   or "off-the-books" fund.

Sprinklr's accounting records are also relied upon to produce reports for our management, stockholders, and creditors, as well as for governmental agencies. Sprinklr relies upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the Securities and Exchange Commission (the "SEC"), and securities laws require that these reports provide full, fair, accurate, timely, and understandable disclosures that fairly present our financial condition and results of operations. Employees who collect, provide, or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that Sprinklr's financial disclosures are accurate and transparent and that our reports contain the information about Sprinklr that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

• No employee may take or authorize any action that would intentionally cause Sprinklr's  financial records or financial disclosures to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC, or other applicable laws, rules, and regulations.

• You must cooperate fully and promptly with Sprinklr's Legal, Finance, and Internal      Audit activities, as well as our independent public accountants. You must respond to    their questions with candor and provide them with complete and accurate information.

• You must help ensure that Sprinklr's books and records, as well as our reports filed    with the SEC, are accurate and complete. No employee should knowingly make (or    cause or encourage any other person to make) any false or misleading statement in    any of our reports filed with the SEC or knowingly omit (or cause or encourage any ?    other person to omit) any information necessary to make the disclosures in any of our    reports accurate in all material respects. Obligations around the integrity and accuracy of Sprinklr's books and records also extend to accurate sales forecasting, as well as the need for all Sprinklrites to maintain accurate and up-to-date information in any of Sprinklr's information systems, tools, and systems of record that they manage and engage with.

Any employee who becomes aware of any departure from these standards must report their knowledge promptly to a manager, the Chief Compliance Officer, the Audit Committee of the Board, or otherwise in accordance with the provisions of Sprinklr's Whistleblower Policy.

73.      Under the heading "Questions, Administration, and Enforcement," under the subheading "Waivers," the Code of Conduct states the following:

Any waiver of this Code for executive officers or directors may be authorized only by Sprinklr's Board of Directors or, to the extent permitted by the rules of any stock exchange on which our capital stock is listed and our Corporate Governance Guidelines, a committee of the Board.  Such waivers will be disclosed to stockholders as required by applicable laws, rules, and regulations.

### *Corporate Governance Guidelines*

74.      Sprinklr also maintains a set of Corporate Governance Guidelines for the Board to follow. The Corporate Governance Guidelines state that the "Role of the Board of Directors" is as follows:

Stockholders select directors to provide oversight and strategic guidance to senior management. A director's responsibility is to fulfill his or her fiduciary duties of care and loyalty, and otherwise to exercise his or her business judgment in the best interests of the Company and its stockholders. Board service requires significant time and attention. More specifically, the Board has responsibilities to review, approve, and monitor fundamental financial and business strategies and significant

corporate actions, assess the Company's major risks, and consider ways to address those risks, select and oversee management, and establish and oversee processes to maintain the Company's integrity. To fulfill their duties, directors must prepare for meetings and discussions with management, participate in Board meetings, review relevant materials, and serve on committees. The Company expects directors to maintain an attitude of constructive involvement and oversight, ask relevant and incisive questions, and demand honest and accurate answers. Directors must act with integrity and demonstrate a commitment to the Company, the Company's values, business, and long-term stockholder value.

75.     Under the heading "Board Responsibilities," the Corporate Governance

Guidelines state:

A director should discharge his or her duties, including duties as a member of any committee on which he or she serves, in good faith and in a manner the director reasonably believes to be in the best interests of the Company and its stockholders. Board members will comply with the laws and requirements of the Exchange and other applicable regulatory agencies and with all policies and guidelines of the Company, including without limitation, the Company's Code of Conduct and Ethics.

Each director is expected to disclose promptly to the Board and respond promptly and accurately to periodic questionnaires or other inquiries from the Company regarding any existing or proposed relationships with the Company, including compensation and stock ownership, which could affect the independence of the director. Each director will also promptly inform the Board of any material change in such information, to the extent not already known by the Board.

Directors have an obligation to protect and keep confidential all of the Company's non-public information unless the Company has authorized public disclosure or unless otherwise required by applicable law. Confidential information includes all non-public information entrusted to or obtained by a director by reason of his or her position on the Board. This includes information regarding the Company's strategy, business, finances, and operations, and will include minutes, reports, and materials of the Board and committees, and other documents identified as confidential by the Company.

Directors may not use such confidential information for personal benefit or to benefit other persons or entities other than the Company. Unless authorized by the Company or applicable law, directors will refrain from disclosing confidential information to anyone outside the Company, especially anyone affiliated with any entity or person that employs the director or has sponsored the director's election to the Board. The confidentiality obligations described above continue even after service on the Board has ended. Any questions or concerns about potential disclosures should be directed to the Company's General Counsel, who then may

communicate with the Chief Executive Officer or the Nominating Committee regarding the potential disclosures.

76.     In violation of the Code of Conduct and Corporate Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Moreover, two of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## SPRINKLR'S AUDIT COMMITTEE CHARTER

77.     The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee "is to assist the Board in fulfilling its oversight responsibilities with respect to: (1) the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements; (2) the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors"); (3) the performance of the Company's internal audit function; and (4) the Company's compliance with legal and regulatory compliance, including risk assessment and compliance with ethical standards adopted by the Company."

78.     Under the heading "Responsibilities," the Audit Committee Charter states that:

The Committee's responsibilities are for oversight, as described under "Purpose" above. The members of the Committee are not employees of the Company, and they do not perform management's or any Auditors' functions. The Committee relies on the expertise and knowledge of management, the internal auditors, and any Auditors in carrying out its oversight responsibilities. Management is responsible for preparing accurate and complete financial statements in accordance with generally accepted accounting principles ("GAAP"), crafting periodic reports, and establishing and maintaining appropriate accounting principles and financial reporting policies and satisfactory internal control over financial reporting. The Auditors will audit the Company's annual consolidated financial statements and, when required, the effectiveness of the Company's internal control over financial reporting and review the Company's quarterly financial statements. It is not the Committee's responsibility to prepare or certify the Company's financial statements, guarantee the audits or reports of the Auditors, certify as to whether any Auditors are "independent" under applicable law or stock exchange listing requirements, or ensure that the financial statements or periodic reports are complete and accurate, conform to GAAP, or otherwise comply with applicable law or stock exchange listing requirements or the Company's policies.

79.     In the same section, under the subheading titled "Auditor Management," the Audit Committee Charter states that the responsibilities of the Audit Committee are as follows, in relevant part:

Evaluation and Retention of Auditors. The Committee will, at least annually, evaluate the performance of the Auditors, assess their independence and qualifications, including the performance and qualifications of the lead partner (taking into account, where appropriate, the views of management and the internal auditors or other personnel responsible for the internal audit function), determine whether to retain, or terminate the engagement of, existing Auditors, and determine the fees of any Auditors and any other registered public accounting firm engaged for the financial reporting process. In addition, the Committee may replace any existing Auditors or other registered public accounting firm engaged for the financial reporting process with a different public accounting firm. The Committee shall recommend the selection of the Auditors for ratification by the stockholders.

Report from Auditors. At least annually, the Committee will obtain and review a report by the Auditors describing that firm's internal quality-control procedures, any material issues raised by the firm's most recent internal quality-control review or peer review or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, with respect to one or more independent audits performed by that firm, as well as any steps taken to address the issues raised.

80.    In the same section, under the subheading titled "Financial Review and Disclosure," the Audit Committee Charter states that the responsibilities of the Audit Committee are as follows, in relevant part:

Annual Audit Results. The Committee will review with management and the Auditors the results of the Company's annual financial statement audit, including:

● the Auditors' assessment of the quality of the Company's accounting principles and practices;

● the Auditors' views about qualitative aspects of the Company's significant accounting practices and the reasonableness of significant judgments and estimates (including material changes in estimates and analyses of the effects of alternative GAAP methods on the financial statements);

● all misstatements identified during the audit (other than those the Auditors believe to be trivial);

● the adequacy of the disclosures in the financial statements; and

● any other matters that the Auditors must communicate to the Committee under applicable accounting or auditing standards.

Audited Financial Statement Review; Quarterly and Annual Reports. The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

Earnings Announcements. The Committee will review and discuss with management and the Auditors any proposed earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to ratings agencies (including, without limitation, reviewing any pro forma or non-GAAP information). To the extent practicable, the Committee will review in advance the script for any earnings or finance-related conference calls to be held for the benefit of the public, analysts and ratings agencies.

Accounting Principles and Policies. The Committee will review and discuss with management and the Auditors significant issues regarding accounting principles and financial-statement presentation, including:

● critical accounting policies and practices;

● alternative accounting policies available under GAAP;

● the potential impact on the Company's financial statements of alternative treatments and any off-balance sheet structures; and

● any other significant reporting issues and judgments, significant regulatory, legal, and accounting initiatives, or developments that may have a material impact on the Company's financial statements, compliance programs, and policies. The Committee will review with the Auditors and management, if appropriate, any written communication, such as any management letter or internal-control letter, and monitor management's response to such communications.

81.    In the same section, under the subheading titled "Internal Control and Procedures,"

the Audit Committee Charter states that the responsibilities of the Audit Committee are as follows,

in relevant part:

Risk Assessment and Management. The Committee will review and discuss with management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company, including but not limited to information security, competition and regulation. Areas of focus for the Committee shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks. The Committee will review and discuss with management the adequacy of the Company's insurance programs, including director and officer insurance, product liability insurance and general liability insurance.

Internal Control over Financial Reporting; Disclosure Controls. The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting, including responsibilities, budget and staff of the internal audit function, and to review the appointment or replacement of the senior internal audit executive or manager, and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

Internal Control Report. At least annually (if required by applicable stock exchange listing requirements) or as may otherwise be determined by the Committee, the Committee will review a report by the Auditors describing its internal quality-control procedures and any material issues raised by (a) that firm's internal quality-control review, (b) any peer review of the firm's internal quality-control procedures or review, or (c) any inquiry or investigation by governmental or professional authorities conducted in the last five years of any audit performed by the Auditors.

Complaint Procedures. The Committee will oversee procedures for receiving, retaining and investigating the following:

● complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and

● confidential and anonymous submissions by employees concerning questionable accounting or auditing matters. In addition, the Committee will oversee procedures for receiving, retaining and investigating any "hotline" complaints or submissions delegated to the Committee by the Board.

Ethical Compliance. The Committee will review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure compliance with applicable laws and stock exchange listing requirements, including the Company's Code of Conduct and Ethics ("Code"). The Committee will consider any request by directors or executive officers of the Company for a waiver from the Code. Any approved waivers shall be promptly disclosed as required by applicable law and stock exchange listing requirements.

Proxy Report. The Committee will oversee the preparation of any report of the Committee required by applicable law or stock exchange listing requirements to be included in the Company's annual proxy statement.

Other Legal and Finance Matters. The Committee will review with management legal and regulatory compliance and any actual, pending or threatened legal or financial matters that could significantly affect the Company's business or financial statements or as otherwise deemed appropriate by the Committee.

82.    In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement,

abuse of control, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

83.    Sprinklr offers an enterprise software-as-a-service platform "purpose-built to help enterprises break down information and organization silos across the customer journey, tap into unstructured digital data and utilize AI to create a persistent, unified view of each customer – at scale." Sprinklr's software is called Unified-CXM, which, according to the Company, "enables customer-facing teams, from Customer Service to Marketing, to collaborate across internal silos, communicate across digital channels, and leverage a complete suite of capabilities to deliver better, more customer experiences at scale – all on one unified, AI-powered platform."

84.    During the Relevant Period, the Individual Defendants represented that, for the 2024 Fiscal Year, the Company kept prioritizing development of its AI capabilities, its entrance into the CCaaS market, and its continued growth from the Company's already-existing portfolio of products.

85.     In so doing, the Individual Defendants minimized the risk Sprinklr faced from seasonality and changes in macroeconomic conditions and overstated the Company's projected revenue and growth outlook. Indeed, contrary to certain of the Individual Defendants material public representations, the Company had migrated from its established growth areas to emphatically prioritize scaling a new business venture with CCaaS—a decision that produced

artificially inflated growth in the short-term. This transition to CCaaS began in the second quarter of 2022—the period ending June 30, 2021. Over the ensuing two fiscal years, the Company injected significant funds into the new venture, which negatively impacted Sprinklr's already-established business. The Individual Defendants further made, and/or caused the Company to make, materially false and misleading statements by routinely making projections that did not consider the problems involved in scaling a new product, in addition to not disclosing that Sprinklr did not have sufficient financial forecasting capabilities at that time.

86.    During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's shift from established sources of growth to emphatically prioritize scaling a new business venture with CCaaS produced artificially inflated growth in the short-term; (2) as such, the Company's already-established sources of revenue were negatively impacted; (3) the Company did not have sufficient financial forecasting capabilities; (4) as a result of this, the Company's growth projections did not consider the problems involved in scaling a new product; (5) the Company minimized the true impact of changing macroeconomic conditions had on the business; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**False and Misleading Statements**

***March 29, 2023 Conference Call***

87.    On March 29, 2023, the Company held an earnings conference call to discuss the

Company's fourth quarter and full year 2023 Fiscal Year financial results. During the call,

Defendant Thomas stated the following about Sprinklr's "success" with entering the CCaaS space:

> In closing, I'd like for you to have three clear takeaways. Number one, we're going
> to be a disruptive player in CCaaS. That's a pretty 30, 40-year old industry. We are
> a digital native company who has created a modern omni-channel approach to
> integrating 30 plus digital channels that now includes voice, and we're challenging
> some of the well-known legacy players with an entirely different approach omni-
> channel and AI base for customer service. ***Number two, we will continue to
> innovate and win in social. It's where we started as a company, and that
> foundation has enabled us to build disruptive new opportunities like we are doing
> in CCaaS.*** And lastly, number three, we are well positioned to begin mainstreaming
> our solutions and AI for customer-facing functions. We have a five-year head-start,
> an advantage in building proprietary AI that's integrated into all products across
> our entire platform, a platform that's built on a highly open, scalable and flexible
> architecture.

88.    During the question-and-answer portion of the call, Defendant Thomas responded

to a question regarding the Company's diversion of resources, stating:

> *Tyler Radke*: Yes. Thank you. And hi, Ragy. I wanted to ask you about just contact
> center, you talked about some interesting milestones on the seat count and the
> recognition in some of the Gartner Magic Quadrant, which is just great to see.
> Wondering if you could just kind of contextualize that a bit more just in terms of
> how big of a mix of that in your business it is today and what you're seeing in the
> pipeline. And is that an area that you're really leaning into in terms of hiring
> specialists just given that's a bit of a different market than where traditionally
> Sprinklr's focused? Thank you.

> *Defendant Thomas*: Yes. So I can confirm that it is a big focus for the company. ***In
> fact, internally, we say this is the year of our contact center business. I can
> confirm that this is something that was very intentional and we have been doing
> steadily for the last several quarters, I would say, for the last probably even 18
> months. So we have been hiring people from traditional contact center
> companies. We have -- we're building out and have built out a team of dedicated
> specialists. So it's very important to have that domain knowledge and vocabulary
> in addition to the technology. So we have staffed everything from the product
> organization to the sales organization and support organization people who have
> been doing it, in some cases, for like 20-25 years, who are also equally elated to
> see a very modern approach to this whole space.***

**May 5, 2023 Proxy Statement**

89.    On May 5, 2023, the Company filed a proxy statement on Schedule 14A ("2023 Proxy Statement") with the SEC. Defendants Agrawal, Gillis, Kanouff, Chambers, Schloss, Wasim, Thomas, and Haverty solicited the 2023 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

90.    The 2023 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Agrawal, Gillis, and Kanouff to the Board; (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

91.    Regarding the "Role of the Board of Directors in Risk Oversight," the 2023 Proxy Statement stated the following, in relevant part:

> One of the key functions of our board of directors is informed oversight of our risk management process. Our board of directors does not have a standing risk management committee, but rather administers this oversight function directly through the board of directors as a whole, as well as through various standing committees of the board of directors that address risks inherent in their respective areas of oversight. In particular, our board of directors is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for our company. The involvement of our full board of directors in reviewing our business is an integral aspect of its assessment of management's tolerance for risk and also its determination of what constitutes an appropriate level of risk.

> While our full board of directors has overall responsibility for risk oversight, it has delegated oversight of certain risks to its committees. Our audit committee monitors our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. Furthermore, our audit committee oversees risks associated with information security, and regularly reviews with management our information security programs and assessment, management and mitigation of such risk. Further, our audit committee also monitors compliance with legal and regulatory requirements, in addition to oversight of the performance of our internal audit function. Our compensation committee monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking. Our nominating and corporate

governance committee oversees our major corporate governance risks, including through monitoring the effectiveness of our corporate governance guidelines.

At periodic meetings of our board of directors and its committees, management reports to and seeks guidance from our board and its committees with respect to the most significant risks that could affect our business, such as legal risks, information security and privacy risks, and financial, tax and audit-related risks. In addition, among other matters, management provides to our audit committee periodic reports on our compliance programs and investment policy and practices.

92.    Regarding the Code of Conduct, the 2023 Proxy Statement stated the following, in relevant part:

Our board of directors has adopted the Sprinklr, Inc. Code of Conduct and Ethics that applies to all officers, directors and employees. The Code of Conduct and Ethics is available on our website at investors.sprinklr.com. If we make any substantive amendments to the Code of Conduct and Ethics or grant any waiver from a provision of the Code of Conduct and Ethics to any executive officer or director, we will promptly disclose the nature of the amendment or waiver on our website rather than by filing a Current Report on Form 8-K.

93.    Defendants Agrawal, Gillis, Kanouff, Chambers, Schloss, Wasim, Thomas, and Haverty caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's shift from established sources of growth to emphatically prioritize scaling a new business venture with CCaaS produced artificially inflated growth in the short-term; (2) as such, the Company's already-established sources of revenue were negatively impacted; (3) the Company did not have sufficient financial forecasting capabilities; (4) as a result of this, the Company's growth projections did not consider the problems involved in scaling a new product; (5) the Company minimized the true impact of changing macroeconomic conditions had on the business; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

94.    The 2023 Proxy Statement was also materially false and misleading because,

despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

95.    As a result of Defendants Agrawal, Gillis, Kanouff, Chambers, Schloss, Wasim, Thomas, and Haverty causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Agrawal, Gillis, and Kanouff to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) approve named executive officer compensation on an advisory, non-binding basis.

### June 5, 2023 Conference Call

96.    On June 5, 2023, the Company held an earnings conference call to discuss the Company's first quarter 2024 Fiscal Year financial results. During the Call, Defendant Thomas discussed the progress of the Company's CCaaS business despite hardships faced by the macro environment, stating:

> So, despite the macro environment, ***we are very pleased with how we're managing, what's in our control with our go-to-market strategy, productivity and execution. Specifically, we're excited about the progress we're making to make it easier to sell, which has been a top priority for the company***. This past quarter, we made several key hires in the service overlay team to add expertise and depth to our CCaaS offering go-to-market, and we continue to verticalize to enable quicker time-to-value and faster deployments. ***We are now up and running for CCaaS, with a couple of more key industries, including financial services and airlines***.

* * *

*I'd love to provide a brief update on Sprinklr Service and our continued momentum as a disruptor in the CCaaS space*. Our vision is to help customers transform the contact center from a voice-focused cost center to a more efficient and effective AI-powered omnichannel revenue center by unifying it with marketing and sales. *IT buyers find Sprinklr to be a great fit for their needs, as they consolidate point solutions in the contact center stack to a platform that's built on a single code base with a very extendable architecture*.

97.    During the question-and-answer portion of the call, there was a question regarding the Company's customers renewing their business, to which Defendant Thomas responded:

*Tyler Radke*: Yes. Thank you. Good evening. I wanted to just ask you about how you're seeing some of the large renewals shape up. I think you've talked about some large renewals expected here in Q2. Some of the other larger front office players have talked about some renewal pressure. We've heard anecdotes of shelf ware and seats that have gone undeployed. How are you expecting your renewal rates to trend? And if you could just remind us on the composition of your revenue base that's seats-based versus usage or interactions-based? Thank you.

*Defendant Thomas*: Okay. **So, there are two questions there. The first one is what are we seeing in our larger deals in terms of renewal. I'll tell you, once you buy into the Sprinklr approach, we keep growing**. And two-story now, we have customers, who call us first before they go put out an RFP or open it up to a point solution, hey, do you guys do it, because they've bought into, they've tuned the AI model, they've set up the governance, they've got the analytics. I'll give you an example of a very, very large, I'd say top five, probably top three tech company that expanded their marketing services with us. And the idea was there was an agency breach that happened and issue that resulted in ad spend that was not governed and approved. So, they just paused spending till everybody got on Sprinklr, so that they can be compliant, right? And so they can have governance and visibility and they can have a global editorial calendar. So, I can confirm to you and you know we had one customer that paid us over $15 million, and if you count the number of customers that are paying over $10 million, that's going up as well.

**July 12, 2023 Investor Day Conference**

98.    On July 12, 2023, the Company hosted its annual Investor Day conference. During the conference, Defendant Sarin discussed the Company's CCaaS and Core Suite businesses, stating, *inter alia*:

**Second takeaway; all product suites are growing at a very healthy rate. I bring this out because many a times investors are of the – have some concerns that is it**

*the case that one product suite is making up for declining growth or tepid growth on another product suite and that isn't the case here.*

99.     In addition, during the Investor Day conference, Defendant Sarin also announced

that Sprinklr had set guidance for $1 billion in subscription revenue for the 2027 Fiscal Year

(ending in January 2027), referring to that number as not just the goal but the "floor", stating:

*What we are comfortable doing is at this point setting $1 billion in subscription revenue as floor for FY 2027. Now, that would compute to roughly an approximate 16% CAGR between now and then. And just so that we are clear, FY 2027 is really calendar year 2026. That ends in January 2027. So it really is three years from now*. So what is baked into these numbers?

What we have taken into account is the current environment persists. I have no way of projecting is there going to be a recession? Is there not going to be a recession? There is any number of pundits you find on CNBC talking about what's going to happen next? I didn't feel it was the right forum for me to make one of those statements. So we feel, given what we know right now, if the current environment persists, *we are comfortable setting $1 billion in subscription revenue as floor*. Said differently, should the environment improve, should sales cycles become shorter; all of that would be upside to these numbers.

Now you'll notice I am not specifically talking about professional services revenue here. And I think that goes back to the earlier point that I made, that we fully expect that professional services mix to morph quite considerably over the next few years. We believe it's going to become a lot more targeted, a lot of it driven by CCaaS delivery and managed services, but the quantum of it may not be very much different than where we are today. So I think if you look at the broader picture, it seems to be a much smaller proportion of overall revenues than where we are today. And it just felt like in terms of setting the stage, subscription revenue is what we need to be measured against and *we are comfortable putting down $1 billion as the floor for subscriptions*[.]

100.     During his own remarks at the Investor Day conference, Defendant Thomas

reiterated the Company's commitment to providing consistent communication to customers,

stating:

But you learn that we obsess about customers. I did 300 meetings last year, and every customer meet, I give them my cell phone number, and I say, call me if you're ever, ever upset. If you think we bullshitted you, call me. If you want to buy, our team will take care of it. My CTO flies over. We have AKA one of my engineers should be here. We've own him with a one way ticket to one of our customers early

on and we told him, don't come back until the customer is happy. If you know other enterprise software companies that do that, buy their stock, right, but they learn it.

* * *

And for us, customer obsession starts when, after the sale, right. Checking in, making sure they get value. They're consuming the software. And we have a price. We don't do NPS. The reason we don't do NPS is we don't want to know whether you would recommend this. We ask you every customer, every quarter, every month, depending on the size of the customer, we ask them, how happy are you at Sprinklr, that's it.

If you give us a 10. It means you're so happy that you're telling your kids about Sprinklr and they go mommy I don't know why you bother me with this stuff. And zero means you red us and we didn't know it. And if you don't give us a 10, we ask you, what are the three things we can x? Three things we get to prioritize, go to a product development process every week regionally it gets escalated. Early days at Sprinklr, I would say there's only one meeting you cannot miss in Sprinklr, it's called CDAP. Well, you could miss if you're attending your funeral you can miss the meeting, otherwise you're on. If your customer is unhappy, you're on. I'm not, I don't get upset at most things, most of you know that, I only curse out of excitement. But if a customer is unhappy and you're not jumping up and down to x it, I will get upset. That's baked into Sprinklr.

### September 6, 2023 Conference Call

101.    On September 6, 2023, the Company held an earnings conference call to discuss the Company's second quarter of the 2024 Fiscal Year financial results.

102.    During the question-and-answer portion of the call, Defendant Sarin responded to a question regarding the Company's renewals for its Core Suite business, stating:

*Pinjalim Bora*: You talked about some early -- or some renewals as well and some large deals. But is there -- I want to ask you if there's a meaningful expansion in the contract durations, which is kind of inflating the year-over-year growth rate, any way to think about that?

*Defendant Sarin*: Yes. And I -- I think, we did call out the fact that, look, our growth in RPO is because several large customers renew on a multi-year basis. But those are the ones you'd remember from even a few years ago, we had them do multi-year billings. So that hasn't happened this time, where we are sticking to annual billings. When I called out on the billing side that there were select customers that renewed early, that was only to make sure that, as you think about your Q3 billings, you do take that into account. ***But I think macro, if you just step back, we're seeing***

*strength in renewal activity, as shown in the multi-year RPO renewals, RPO numbers, as well as our sense around overall billings for the year*.

103.    In response to a question about the consistency of the Company's renewal rates,

Defendants Thomas and Sarin both replied:

*Tyler Radke*: Yes. Hi. Thanks for taking the question. Wanted to just hear how you're seeing things trend so far in Q3. Sounded like some really good execution in the quarter on the renewals and the large eight-figure transaction. But have things been consistent in Q3 versus Q2? What are you just expecting in terms of the large deal potential in the second half? Thank you.

*Defendant Thomas*: Well, I'll take the first part of it, and maybe Manish can talk about the next quarter. Look, the macroenvironment is just about as uncertain as it was, and it has been. So we -- ***we're not seeing any different behavior this quarter or last quarter than we saw before***. Budgets are tight, there's more CFO scrutiny and all the good things that come with people being not very sure where the market's going, right, and interest rates are going to be. ***But I think what you're seeing is, like a consistent trickling impact of our better execution and focus on go-to-market***.

*Defendant Sarin*: Yes. And just to make sure I understand, was your question, Tyler, are we seeing anything different in the month or so of Q3 that we've been in compared to Q2? Was that what you were trying to ask?

*Radke*: Yes. Sorry. So I guess, I'll rephrase the question slightly to make it more specific, and apologies for the background noise. But really, the question was just, you saw some really good, large deal activity in Q2. I know there's been a lot of noise around RPO and current RPO because of the multi-year renewal cycle. So I'm just curious if there's any things to call out in terms of RPO, volatility? And just how your overall large deals, you're expecting those to land in Q3, Q4, just anything that would be noteworthy to call out as we're building our models? Thank you.

*Defendant Sarin*: Hey, yes, thank you for that clarification, Tyler. But there's nothing that I would call out at this stage. We -- as I look at the quantum of business that we are booking, it sort of seems in-line with what we would expect. It's -- like any enterprise software company, we're pretty back-end loaded, so I wouldn't make any broad assumptions around how Q3 and Q4 would land. But ***there is nothing that we are seeing today that would give us any cause for concern. It's sort of along the lines of what we would expect. So -- so steady is what I would say***.

### *September 7, 2023 Citi Global Technology Conference*

104.    On September 7, 2023, Defendant Sarin represented the Company at the Citi

Global Technology Conference.

105.    While at the conference, Defendant Sarin answered an analyst's question regarding

the Company selling the Core Suite and Sprinklr Service, stating:

> *Tyler Radke*: So, talking about the go-to-market, there are a couple of areas I wanted to hit on. First, just as you think about your success in CCaaS, I mean, certainly CCaaS and social, there is some synergies, right? Because to be able to serve customers, you got to ingest all this omni-channel information. But in terms of the buyer at organization, especially in the enterprise where you sit, it often can be different departments and different organizations. So, I guess what have you had to do on the go-to-market side to really have that success in CCaaS.
>
> *Defendant Sarin*: Yeah, **I think that's a fantastic question because we were acutely aware that the buyer for our traditional set of products, our core products, was somebody in the marketing team. And as we are outselling CCaaS, in some companies, social care is still with marketing. So that's an easier sell. When you're obviously trying to do a full stack replacement, that is sitting with the CIU as an example. So, what we have done is two things. One is there is a specialist overlay team today, so that we started hiring, I'd say, about 9, 12 months ago. And they've come from your big CCaaS vendors. They sort of know the lingo. They know how to go about selling the product. They know where the bodies are buried. So, they've been a tremendous addition to the sales team. And so, we have aligned them by, what we call, sort of divisional leaders. So, in the US, there'll be, several of them, same in EMEA same in APJ. And the idea there is they worked hand in glove with the individual reps in the territories to unearth new CCaaS opportunities. So, that's something that's working really well**.

106.    In response to another question regarding the tradeoff between growth and

margins, Defendant Sarin responded:

> *Tyler Radke*: Great. So, shifting a little bit to the cost side, you mentioned, Manish, and when you joined you – relative to when you joined, margins are considerably higher. Maybe just frame for us what were some of the efficiencies that you were able to unlock at the company? I know you're never done finding efficiencies as a CFO, but are we kind of mostly through those initial things you've identified and how should we just think about the tradeoff of growth versus margins as we go forward?
>
> *Defendant Sarin*: Yeah, I think that's a fantastic question, because one of the things we've been very clear in saying is maybe in the past, investments in the company were not entirely thought through the lens of what is unit economics or is productivity per rep improving. And I think we're now just applying a little bit more careful analysis, if you will, before we make any more investments, right? **So, I**

41

*don't think one should view it in the lens of is this a cost versus growth trade off because we believe we have enough investments in place that should allow us to grow at the rate that we are growing.* So, where are we getting all these efficiencies from? Even things like when I said technology, solution brokers for CCaaS, that obviously means I don't need that many direct reps selling CCaaS because I have partners doing it for me, right?

107.    The statements in paragraphs ¶¶87-88 and 96-106 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's shift from established sources of growth to emphatically prioritize scaling a new business venture with CCaaS produced artificially inflated growth in the short-term; (2) as such, the Company's already-established sources of revenue were negatively impacted; (3) the Company did not have sufficient financial forecasting capabilities; (4) as a result of this, the Company's growth projections did not consider the problems involved in scaling a new product; (5) the Company minimized the true impact of changing macroeconomic conditions had on the business; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Begins to Emerge as False and Misleading Statements Continue

*December 6, 2023 Conference Call*

108.    The truth began emerging on December 6, 2023, when the Company held an earnings conference call to discuss the Company's third quarter of the 2024 Fiscal Year financial results. During the call, Defendant Thomas stated the following, in relevant part:

*The investments we've been making over the last 18 months are enabling us to Mainstream our product suites into large replacement markets starting with establishing ourselves as a disruptor in CCaaS. As we've diversified the business*

*and focused on scaling our CCaaS business, I would like to acknowledge that they've made slower progress on some of our other go-to-market initiatives focused on our core product suites.*

109.    Also, during the call, Defendant Sarin stated the following properly scaling the

Sprinklr service, stating:

*Our primary strategic focus in FY '24 has been to rapidly scale our Sprinklr service product suite. We are very pleased with the results, having made significant demonstrable progress with Sprinklr service, gaining market share and customer momentum in the CCaaS market.*

As Ragy mentioned, *our focus on succeeding in our CCaaS business slowed progress with some of our other go-to-market initiatives in our core product suites, much more than we had anticipated.*

110.    During the question-and-answer portion of the call, Defendant Thomas responded

to one analyst's question regarding headwinds, stating:

*Michael Vidovic*: Hi, this is Michael Vidovic on for Michael Turits and thanks for taking my question. On the headwinds you talked about seeing this quarter with the over-rotation the down sell pressure. I guess, were you not seeing those same dynamics in Q2 and Q3 and like a similar frequency? Or is that still relatively new for this quarter? Thanks.

*Defendant Thomas*: : It's kind of consistent, right? But because as Manish said, we have a much bigger base coming up in Q4. So we're not seeing the macro environment get better or get worse. And so I wouldn't characterize it something changed in Q4.

* * *

*Defendant Thomas*: But I would, again, to reconcile the two, right, the macro, we don't think is what's changing. *It's really our over-rotation that's causing the change that, where Manish has articulated.*

111.    Similarly, in acknowledging the negative effect the "over-rotation" has had on the

Company, Defendant Sarin stated:

At this time, based on what I just outlined, coupled with an unforgiving macro environment, we expect a sequential quarterly increase of 2.5% for each quarter of FY '25. *This equates to approximately a 10% total revenue growth for the full year, which we believe is the appropriate starting point for FY '25.*

112.    On this news, the price of the Company's common stock fell $5.59 per share, or approximately 33%, from a closing price of $16.70 per share on December 6, 2023 to a closing price of $11.11 per share on December 7, 2023. However, the Individual Defendants continued to obfuscate the truth about the Company.

113.    For example, on the same call, Defendant Thomas responded to one analyst's question regarding the Company's internal resource allocations, stating:

> *Arjun Bhatia*: Okay. Got it. And then, just as we look to the other side of this, when you think about the go-to market revamp, what are some of the steps that you need to take to, you know, I guess, refocus on the broader suite? Is there incremental hiring that needs to happen? Or is it more a matter of, you know, internal resource allocation enablement, et cetera?
>
> *Defendant Thomas*: ***It's more of an internal resource allocation. In hindsight, I think the most obvious explanation for this is the fact that we, and I don't know whether we would have, knowing everything we know, done it differently. We kind of over-rotated a little bit more on the CCaaS side. And so we took our field and we incented them strongly to go sell CCaaS***. And essentially there's a lot of people who jumped in and really are happy and we're thrilled with the results.
>
> And there are some that jumped but didn't quite -- jump -- didn't quiet [sic], make it on the other side. ***And the the [sic] fix is quite obvious to all of us. You've got to take the field folks in sales and support and service that came from the social suite background or the marketing suite background or the research inside suite background, and we got to let them go back and focus on it***.
>
> So what we are doing now, as we think and plan for the next year is we are adjusting quotas and we are just bifurcating or trifurcating the field to just -- so you can fix the over-rotation. We did, and we're pretty hopeful that in one or two quarters, we'll begin to see some data that would allow us to just update you further.

114.    Additionally, in response to a question about the $1 billion guidance from the Investor Day, Defendant Sarin responded:

> *Noah Herman*: Got it. No. Thanks so much for that answer. And then maybe just focusing a little bit more on the model as we sort of contemplate the preliminary 2025 guidance. You know, how does that, if anything, does that change at all the long-term model that you had outlined during your Analyst Day? How should we really think about that going forward?

*Defendant Sarin*: Yeah. **It does not change our FY '27 long-term plan**. And again, just to be clear, this is not our guide for '25. I will do that in our March earnings call. Just given the some of the renewal pressures we are seeing here in Q3. And as I said Q4, we expect it to be, you know, quite intense. Given the visibility that we have, and we just wanted to be clear that we laid out what we are seeing right now, it might change substantially when we talk in March, and we talk about the full year guide. **But sitting where we sit today, we don't feel any difference about FY '27 than we did six months ago**.

**March 27, 2024 Press Release**

115.    On March 27, 2024, the Company issued a press release that reported the Company's fourth quarter and full year of the 2024 Fiscal Year financial results. The press release represented the following, in relevant part:

> Sprinklr is providing the following guidance for the full fiscal year ending January 31, 2025:
> • Subscription revenue between $740.5 million and $741.5 million.
> • Total revenue between $804.5 million and $805.5 million.
> • Non-GAAP operating income between $104 million and $105 million.
> • Non-GAAP net income per share between $0.38 and $0.39, assuming 291 million diluted weighted-average shares outstanding.

**March 27, 2024 Conference Call**

116.    That same day, the Company held an earnings conference call to discuss the Company's fourth quarter and full year of the 2024 Fiscal Year financial results.

117.    During the question-and-answer portion of the call, Defendant Thomas responded to a question regarding its reallocation of resources towards Sprinklr Service by stating the following:

> *Jackson Adler*: Okay. Alright. Gotcha. And then on the renewals pressure, so expecting it kind of to persist here in the first half and then maybe start to go away. I'm just curious, like, how do we know that the pressure will end. Is there something -- is there some cohort or is there something specific about the renewals that are going to be happening over the next couple of quarters that you can point to and say like, they are different from what the renewals will look like after we get past this first half.

*Defendant Thomas*: Okay. So I think, first off, I got to tell you, we put a lot of energy behind understanding what is going on. ***And what I can confirm, as we've done in the past, is we think the majority of it is self-inflicted. And what we're finding that is that the best execution of our team versus the best execution of any competitor in our core markets and the CCaaS frankly we win. So what we're finding is -- and I say it's self-inflicted because weak execution on our side, meeting strong execution of the competitor is when we are losing. And so it gives us a lot of confidence that these are fixable things and it's a part of this big set of initiatives that we have outlined. And like we said, it's going to take a few quarters, but right now we're pretty optimistic that we should see a retention go back to our historic norms once our execution and what we can control is addressed***.

118.    The statements in paragraphs ¶¶113-117 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's shift from established sources of growth to emphatically prioritize scaling a new business venture with CCaaS produced artificially inflated growth in the short-term; (2) as such, the Company's already-established sources of revenue were negatively impacted; (3) the Company did not have sufficient financial forecasting capabilities; (4) as a result of this, the Company's growth projections did not consider the problems involved in scaling a new product; (5) the Company minimized the true impact of changing macroeconomic conditions had on the business; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### May 3, 2024 Proxy Statement

119.    On May 3, 2024, the Company filed a proxy statement on Schedule 14A ("2024 Proxy Statement") with the SEC. Defendants Pham, Agrawal, Gillis, Kanouff, Schloss, Wasim, Thomas, and Haverty solicited the 2024 Proxy Statement, pursuant to Section 14(a) of the

Exchange Act, which contained material misstatements and omissions.

120.    The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Pham, Schloss, and Wasim to the Board; (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the 2025 Fiscal Year; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

121.    Regarding the "Role of the Board of Directors in Risk Oversight," the 2024 Proxy Statement stated the following, in relevant part:

> One of the key functions of our board of directors is informed oversight of our risk management process. Our board of directors does not have a standing risk management committee, but rather administers this oversight function directly through the board of directors as a whole, as well as through various standing committees of the board of directors that address risks inherent in their respective areas of oversight. In particular, our board of directors is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for our company. The involvement of our full board of directors in reviewing our business is an integral aspect of its assessment of management's tolerance for risk and also its determination of what constitutes an appropriate level of risk.

> While our full board of directors has overall responsibility for risk oversight, it has delegated oversight of certain risks to its committees. Our audit committee monitors our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. Furthermore, our audit committee oversees risks associated with information security, and regularly reviews with management our information security programs and assessment, management and mitigation of such risk. Further, our audit committee also monitors compliance with legal and regulatory requirements, in addition to oversight of the performance of our internal audit function. Our compensation committee monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking. Our nominating and corporate governance committee oversees our major corporate governance risks, including through monitoring the effectiveness of our corporate governance guidelines.

> At periodic meetings of our board of directors and its committees, management reports to and seeks guidance from our board and its committees with respect to the most significant risks that could affect our business, such as legal risks, information

security and privacy risks, and financial, tax and audit-related risks. In addition, among other matters, management provides to our audit committee periodic reports on our compliance programs and investment policy and practices.

122.    Regarding the Code of Conduct, the 2024 Proxy Statement stated the following, in relevant part:

Our board of directors has adopted the Sprinklr, Inc. Code of Conduct and Ethics that applies to all officers, directors and employees. The Code of Conduct and Ethics is available on our website at investors.sprinklr.com. If we make any substantive amendments to the Code of Conduct and Ethics or grant any waiver from a provision of the Code of Conduct and Ethics to any executive officer or director, we will promptly disclose the nature of the amendment or waiver on our website rather than by filing a Current Report on Form 8-K.

123.    Defendants Pham, Agrawal, Gillis, Kanouff, Schloss, Wasim, Thomas, and Haverty caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's shift from established sources of growth to emphatically prioritize scaling a new business venture with CCaaS produced artificially inflated growth in the short-term; (2) as such, the Company's already-established sources of revenue were negatively impacted; (3) the Company did not have sufficient financial forecasting capabilities; (4) as a result of this, the Company's growth projections did not consider the problems involved in scaling a new product; (5) the Company minimized the true impact of changing macroeconomic conditions had on the business; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

124.    The 2024 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the

Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

125.    As a result of Defendants Pham, Agrawal, Gillis, Kanouff, Schloss, Wasim, Thomas, and Haverty causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Pham, Schloss, and Wasim to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) approve named executive officer compensation on an advisory, non-binding basis.

## THE TRUTH EMERGES

### June 5, 2024 Press Release

126.    On June 5, 2024, the truth fully emerged when the Company issued a press release that revealed the Company was revising its guidance for the second quarter and full year, stating the following, in relevant part:

> Sprinklr is providing the following guidance for the full fiscal year ending January 31, 2025:
> • Subscription revenue between $714 million and $716 million.
> • Total revenue between $779 million and $781 million.
> • Non-GAAP operating income between $104 million and $105 million.
> • Non-GAAP net income per share between $0.40 and $0.41, assuming 276 million diluted weighted-average shares outstanding.

### June 5, 2024 Conference Call

127.    That same day, the Company held an earnings conference call to discuss the Company's earlier issued revised guidance and provide a second quarter update. During the call, Defendant Thomas stated the following, in relevant part:

This quarter, we made good progress with these leadership changes and operational improvement. ***However, these changes are significant and will take time to show measurable improvements. Furthermore, implementing these changes during what has become a more challenging macro environment has created more short-term volatility than we expected. In the first quarter, buying behavior was more measured, sales cycles were longer, and budget scrutiny on renewals increased as well. As a result, Q1 performance reflects lower net new bookings and increased customer churn. Based on the current outlook for the year, we are lowering our revenue guidance for FY '25, but are committed to diligently managing the business and maintaining our non-GAAP operating income guidance. Manish will provide more details in his remarks***.

* * *

Look, there are three things that are super clear to us. One is, as we said, the macro is we're experiencing a pronounced change. ***Second, our go-to-market motion and the transition to the level of maturity that we need to have for a business of this scale and size, we are not there and it's taking us longer***. And I'm not going to go through all of it. I'm sure we can follow up in the actions. ***But with the kind of people that we have around us and inside the company, what [we] needed to do was fairly clear. And what we realized as we went late last year and looked at our own progress, needless to say, no one, including myself, was happy with the pace of progress***. And what we decided to do was to upgrade and make significant upgrades to the leadership, starting at the very top, right? That's what the investors and the Board would love to see.

* * *

***I'll acknowledge that we're seeing increased pressure on the core, which is everything outside of CCaaS the way we see it. And what we're finding is more price compression***. We're not seeing like a crazy amount of logo churn. We're not seeing, I'm sure there'll be a question, we're not seeing the competitive dynamics shift. What we're finding is CIOs and CMOs looking at their top spend and looking to find money. And we're a premium provider. We were able to command premium prices. ***And we're just getting squeezed. And that I see as the primary driver***. And a lot of these as, Arjun, I'm making more calls than you would ever expect someone like me to be doing to these customers. ***And I can tell you firsthand, a lot of it is our own execution*** . . . .

128.    During his own comments on the call, Defendant Sarin revealed that the Company "***continue[d] to experience higher churn in our core product suites, driven by reduced marketing spend, elimination of programs, and seat reductions***," and that the high churn would likely continue throughout the 2025 Fiscal Year.

50

129.    On this news, the price of the Company's common stock fell $1.64 per share, or approximately 15%, from a closing price of $10.84 per share on June 5, 2024 to a closing price of $9.20 per share on June 6, 2024.

## REPURCHASES DURING THE RELEVANT PERIOD

130.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of ***over $170,697*** to repurchase approximately 14,031 shares of its own common stock at artificially inflated prices between November 27, 2023 and July 28, 2024.

131.    According the annual report filed on Form 10-K with the SEC on March 29, 2024 ("2023 10-K"), between January 1, 2024 and January 31, 2024, the Company repurchased 2,400 shares of its own common stock at an average price per share of approximately $12.31, for a total cost to the Company of approximately $29,544.

132.    As the Company's stock was actually worth only $9.20 per share, the price at closing on June 6, 2024, the Company overpaid by approximately $7,464 for repurchases of its own stock between January 1, 2024 and January 31, 2024.

133.    According to the quarterly report filed on Form 10-Q with the SEC on June 5, 2024 ("1Q 2024 10-Q"), between February 1, 2024 and February 29, 2024, the Company repurchased 1,920 shares of its own common stock at an average price per share of approximately $12.68, for a total cost to the Company of approximately $24,345.60.

134.    As the Company's stock was actually worth only $9.20 per share, the price at closing on June 6, 2024, the Company overpaid by approximately $6,681.60 for repurchases of its own stock between February 1, 2024 and February 29, 2024.

135.     According to the 1Q 2024 10-Q, between March 1, 2024 and March 31, 2024, the Company repurchased 909 shares of its own common stock at an average price per share of approximately $12.78, for a total cost to the Company of approximately $11,617.02.

136.     As the Company's stock was actually worth only $9.20 per share, the price at closing on June 6, 2024, the Company overpaid by approximately $3,254.22 for repurchases of its own stock between March 1, 2024 and March 31, 2024.

137.     According to the 1Q 2024 10-Q, between April 1, 2024 and April 30, 2024, the Company repurchased 5,512 shares of its own common stock at an average price per share of approximately $11.82, for a total cost to the Company of approximately $65,151.84.

138.     As the Company's stock was actually worth only $9.20 per share, the price at closing on June 6, 2024, the Company overpaid by approximately $14,441.44 for repurchases of its own stock between April 1, 2024 and April 30, 2024.

139.     According to the quarterly report filed on Form 10-Q with the SEC on September 4, 2024 ("2Q 2024 10-Q"), between May 1, 2024 and May 31, 2024, the Company repurchased 3,290 shares of its own common stock at an average price per share of approximately $3,290, for a total cost to the Company of approximately $40,039.30.

140.     As the Company's stock was actually worth only $9.20 per share, the price at closing on June 6, 2024, the Company overpaid by approximately $9,771.30 for repurchases of its own stock between May 1, 2024 and May 31, 2024.

141.     Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by ***$41,594.16***

## DAMAGES TO SPRINKLR

142.     As a direct and proximate result of the Individual Defendants' conduct, Sprinklr

will lose and expend many millions of dollars.

143.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and its CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

144.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

145.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

146.    Such expenditures include the $41,594.16 that the Individual Defendants caused the Company to overpay for repurchases of its own stock while the stock price was artificially inflated as a result of the false and misleading statements alleged herein.

147.    Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

148.    As a direct and proximate result of the Individual Defendants' conduct, Sprinklr has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust

enrichment.

## DERIVATIVE ALLEGATIONS

149.    Plaintiff brings this action derivatively and for the benefit of Sprinklr to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Sprinklr, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

150.    Sprinklr is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

151.    Plaintiff is, and has been at all relevant times, a shareholder of Sprinklr. Plaintiff will adequately and fairly represent the interests of Sprinklr in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

152.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

153.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Sprinklr's Board consisted of the following ten individuals: Defendants Agrawal, Gillis, Kanouff, Schloss, Wasim, Thomas, and Haverty (the "Director-Defendants") and non-parties Jan R. Hauser ("Hauser"), Rory Read ("Read"), and Stephen M. Ward, Jr. ("Ward") (collectively, with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time this action was filed.

154.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme

they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, and as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by **over $41,000** for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

155.     The Director-Defendants solicited the 2023 and 2024 Proxy Statements to call for a shareholder vote to, *inter alia*, re-elect Defendants Pham, Schloss, Wasim, Agrawal, Gillis, and Kanouff to the Board, thus allowing them to continue breaching their fiduciary duties to Sprinklr.

156.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Sprinklr to issue materially false and misleading statements. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

157.     Additional reasons that demand on Defendant Thomas is futile to follow. Defendant Thomas founded the Company in 2009, and from its founding until June 2024, served as the CEO and as a Company director. The Company provided Defendant Thomas with his principal occupation, for which he received handsome compensation. Furthermore, he solicited

the false and misleading 2023 and 2024 Proxy Statements, which contained false and misleading statements and contributed to the re-election of Defendants Agrawal, Gillis, Kanouff, Pham, Schloss, and Wasim to the Board, which allowed them to continue to breach their fiduciary duties to the Company. As the trusted CEO, Defendant Thomas conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. He is also a defendant in the Securities Class Action. Furthermore, he engaged in lucrative insider trading while in possession of material nonpublic information, obtaining personal proceeds of approximately $1 million.  For these reasons, too, Defendant Thomas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158.    Additional reasons that demand on Defendant Agrawal is futile to follow. Defendant Agrawal has served as a Company director since June 2011. He currently serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Agrawal received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Agrawal solicited the false and misleading 2023 and 2024 Proxy Statements, which contained false and misleading statements and contributed to the re-election of Defendants Gillis, Kanouff, Pham, Schloss, Wasim, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the

scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Agrawal breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159.    Additional reasons that demand on Defendant Gillis is futile follow. Defendant Gillis has served as a Company director since November 2023. He also serves as the Chair of the Audit Committee. Defendant Gillis has received and continues to receive handsome compensation for his role as Company director. In addition, Defendant Gillis solicited the false and misleading 2023 and 2024 Proxy Statements, which contained false and misleading statements and contributed to the re-election of Defendants Agrawal, Kanouff, Pham, Schloss, Wasim, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Gillis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160.    Additional reasons that demand on Defendant Kanouff is futile follow. Defendant Kanouff has served as a Company director since August 2018. She also serves as a member of the Nominating and Corporate Governance Committee. Defendant Kanouff has received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Kanouff solicited the false and misleading 2023 and 2024 Proxy Statements, which

contained false and misleading statements and contributed to the re-election of Defendants Agrawal, Pham, Schloss, Wasim, Gillis, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Kanouff breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

161.    Additional reasons that demand on Defendant Schloss is futile follow. Defendant Schloss has served as a Company director since January 2022. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. Defendant Schloss has received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Schloss solicited the false and misleading 2023 and 2024 Proxy Statements, which contained false and misleading statements and contributed to the re-election of Defendants Agrawal, Pham, Kanouff, Wasim, Gillis, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Schloss breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

162.    Additional reasons that demand on Defendant Wasim is futile to follow. Defendant Wasim has served as a Company director since October 2020. He also serves as a member of the Audit Committee and as the Chair of the Compensation Committee. In addition, Defendant Wasim solicited the false and misleading 2023 and 2024 Proxy Statements, which contained false and misleading statements and contributed to the re-election of Defendants Agrawal, Pham, Kanouff, Schloss, Gillis, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Wasim breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

163.    Additional reasons that demand on Defendant Haverty is futile follow. Defendant Haverty has served as a Company director since December 2022. He also serves as a member of the Compensation Committee. Defendant Haverty has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Haverty solicited the false and misleading 2023 and 2024 Proxy Statements, which contained false and misleading statements and contributed to the re-election of Defendants Agrawal, Pham, Kanouff, Schloss, Gillis, and Wasim to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and

consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Haverty breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164.    Additional reasons that demand on the Board is futile follow.

165.    Defendants Agrawal, Gillis and Wasim (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

166.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the

Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

167.    Sprinklr has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Sprinklr any part of the damages Sprinklr suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

168.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

169.    The acts complained of herein constitute violations of fiduciary duties owed by Sprinklr's officers and directors, and these acts are incapable of ratification.

170.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Sprinklr. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that

eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Sprinklr, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

171.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Sprinklr to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

172.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM
**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

173.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

174.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

175.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

176.    Under the direction and watch of Defendants Pham, Agrawal, Gillis, Kanouff, Schloss, Wasim, Thomas, and Haverty, the 2024 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

177.    Under the direction and watch of Defendants Agrawal, Gillis, Kanouff, Chambers, Schloss, Wasim, Thomas, and Haverty, the 2023 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

178.    The 2024 and 2023 Proxy Statements also failed to disclose that: (1) the Company's shift from established sources of growth to emphatically prioritize scaling a new business venture with CCaaS produced artificially inflated growth in the short-term; (2) as such, the Company's already-established sources of revenue were negatively impacted; (3) the Company did not have sufficient financial forecasting capabilities; (4) as a result of this, the Company's growth projections did not consider the problems involved in scaling a new product; (5) the Company minimized the true impact of changing macroeconomic conditions had on the business; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

179.    In exercise of reasonable care, Defendants Pham, Agrawal, Gillis, Kanouff, Schloss, Wasim, Thomas, and Haverty should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to the re-election of Defendants.

180.    The false and misleading elements of the 2024 Proxy Statement led to, among other things, the re-election of Defendants Pham, Schloss, and Wasim to the Board, which allowed them to continue to breach their fiduciary duties to the Company.

181.    In exercise of reasonable care, Defendants Agrawal, Gillis, Kanouff, Chambers, Schloss, Wasim, Thomas, and Haverty should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff

in voting on matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to the re-election of Defendants.

182.    The false and misleading elements of the 2023 Proxy Statement led to, among other things, the re-election of Defendants Agrawal, Gillis, and Kanouff to the Board, which allowed them to continue to breach their fiduciary duties to the Company.

183.    The Company was damaged as a result of Defendants Pham, Agrawal, Gillis, Kanouff, Schloss, Wasim, Thomas, and Haverty's material misrepresentations and omissions in the 2024 Proxy Statement.

184.    The Company was damaged as a result of Defendants Agrawal, Gillis, Kanouff, Chambers, Schloss, Wasim, Thomas, and Haverty's material misrepresentations and omissions in the 2023 Proxy Statement.

185.    Plaintiff, on behalf of Sprinklr, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

186.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187.    The Individual Defendants, by virtue of their positions with Sprinklr and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Sprinklr and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Sprinklr to engage in the illegal conduct and practices complained of herein.

188.    Plaintiff, on behalf of Sprinklr, has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

189.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Sprinklr. Not only is Sprinklr now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Sprinklr by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase *14,031* of its own shares at artificially inflated prices, damaging Sprinklr.

191.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

192.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Sprinklr not misleading.

193.    The Individual Defendants as top executives and directors acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless

disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

194.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

195.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

196.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Sprinklr's business and affairs.

197.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

198.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Sprinklr.

199.    In breach of their fiduciary duties owed to Sprinklr, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's shift from established sources of growth to emphatically prioritize scaling a new business venture with CCaaS produced artificially inflated growth in the short-term; (2) as such, the Company's already-

established sources of revenue were negatively impacted; (3) the Company did not have sufficient financial forecasting capabilities; (4) as a result of this, the Company's growth projections did not consider the problems involved in scaling a new product; (5) the Company minimized the true impact of changing macroeconomic conditions had on the business; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

200.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

201.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

202.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices before the fraud was exposed, while two of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $5.5 million.

203.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even

though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

204.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

205.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Sprinklr has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

206.    Plaintiff, on behalf of Sprinklr, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

207.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

208.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Sprinklr.

209.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Sprinklr that was tied to the performance or artificially inflated valuation of Sprinklr, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

210.    Plaintiff, as a shareholder and representative of Sprinklr, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other

compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

211.    Plaintiff, on behalf of Sprinklr, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

212.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

213.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Sprinklr, for which they are legally responsible.

214.    As a direct and proximate result of the Individual Defendants' abuse of control, Sprinklr has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

215.    Plaintiff, on behalf of Sprinklr, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

216.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

217.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Sprinklr in a manner consistent with the operations of a publicly held corporation.

218.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Sprinklr has sustained and will continue to sustain significant damages.

219.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

220.    Plaintiff, on behalf of Sprinklr, has no adequate remedy at law.

## EIGHTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

221.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

222.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

223.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

224.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

225.    Plaintiff, on behalf of Sprinklr, has no adequate remedy at law.

## NINTH CLAIM
### Against Defendants Thomas and Sarin for Contribution Under Sections 10(b) and 21D of the Exchange Act

226.    Plaintiff incorporates by reference and realleges each and every allegation set forth in above, as though fully set forth herein.

227.    Sprinklr and Defendants Thomas and Sarin are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the

federal securities laws, the Company's liability will be in whole or in part due to Defendants Thomas's and Sarin's willful and/or reckless violations of their obligations as officers, directors, and/or former officers Sprinklr.

228.    Defendants Thomas and Sarin, because of their positions of control and authority as officers and/or directors of Sprinklr, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Sprinklr, including the wrongful acts complained of herein and in the Securities Class Action.

229.    Accordingly, Defendants Thomas and Sarin are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

230.    As such, Sprinklr is entitled to receive all appropriate contribution or indemnification from Defendants Thomas and Sarin.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Sprinklr, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Sprinklr;

(c)    Determining and awarding to Sprinklr the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)      Directing Sprinklr and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Sprinklr and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Sprinklr to nominate at least five candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)      Awarding Sprinklr restitution from the Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury.

Dated: March 18, 2025

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/Timothy Brown*
Timothy Brown
Saadia Hashmi
Elizabeth Donohoe
767 Third Avenue, Suite 2501
New York, NY 10017
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
        shashmi@thebrownlawfirm.net
        edonohoe@thebrownlawfirm.net

*Counsel for Plaintiff*

## **<u>VERIFICATION</u>**

I, Sara Beth Coffey, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this <u>16</u> day of March, 2025.

DocuSigned by:

*Sara Beth Coffey*

CD493212A0F34E2...

Sara Beth Coffey